UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MATTHEW BRADY,

      Plaintiff,

v.                                          Case No. 8:06-cv-191-T-24MAP

SANTA SWEETS, INC.,

      Defendant.
_____/

**ORDER**

This cause comes before the Court for consideration of Defendant's[1] motion for summary judgment (Doc. No. 17). Plaintiff has filed a response in opposition thereto (Doc. No. 21).

**I.**     **Background**

Plaintiff Matthew Brady ("Plaintiff") is a Caucasian male. Defendant operates a packinghouse in Plant City, Florida where it processes several varieties of tomatoes which it grows and harvests (Rivera Aff., ¶3).

**A.**     **Defendant's Operations**

Defendant's packinghouse operates several processing lines which are delineated by the type of tomatoes serviced, and includes processing lines for the Ugly Ripe, Roma, round, and grape tomato varieties (Rivera Aff., ¶ 3). Operations Manager Manual Rivera ("Rivera") oversees the operation of the Ugly Ripe, Roma, and round tomato lines (Rivera Aff., ¶ 2). Rivera has held this position since he was hired in February 2005 (Rivera Aff., ¶ 2).

---

[1] Ag-Mart Produce, Inc. ("Ag-Mart") d/b/a Santa Sweets, Inc.

1

To process Ugly Ripe tomatoes, pallets of harvested Ugly Ripe tomatoes are delivered to Defendant's packinghouse facility by refrigerated trucks and unloaded by a forklift operator (Plaintiff's Depo., pp. 19 and 27 and Rivera Aff., ¶ 4). The pallets are staged in the facility's cooler until the tomatoes sufficiently ripen for further processing (Rivera Aff., ¶ 4). While in the cooler, the pallets are rotated by a forklift operator on a daily basis so that ripe tomatoes are available for processing first (Plaintiff's Depo., pp. 28-30 and Rivera Aff., ¶ 4). Once the Ugly Ripe tomatoes are ripe, a forklift operator transports the pallets from the cooler to the Ugly Ripe processing line where line workers sort, grade, clean, and pack each tomato (Plaintiff's Depo., pp. 19 and 27 and Rivera Aff., ¶ 5). There is only one forklift operator assigned to the Ugly Ripe and round tomato processing lines (Plaintiff's Depo., pp. 19-21 and 28). While pallet jack operators also assist in moving pallets of tomatoes to and from staging areas, they do not operate in the cooler as the pallets in the cooler are stacked in such a way that they are only accessible with an industrial forklift (Plaintiff's Depo., pp. 30 and 40-44 and Rivera Aff., ¶ 5).

### B.   **Plaintiff's Employment with Defendant**

#### 1.   **Fork Lift Operator**

Defendant hired Plaintiff in late August 2004 to work as the forklift operator for the Ugly Ripe and round tomato lines (hereinafter "Ugly Ripe fork lift operator")(Plaintiff's Depo., pp. 16-17, 19, 24 and 27). Plaintiff's immediate supervisor was Sean Strano ("Strano"), the Ugly Ripe tomato line supervisor (Plaintiff's Depo., pp. 16 and 18 and Rivera Aff., ¶ 6). When Rivera was hired as Operations Manager in 2005, Strano began reporting to Rivera (Rivera Aff., ¶ 6). From the time of Plaintiff's hire up until Rivera was hired as Operations Manager, Plaintiff worked Monday through Friday (Plaintiff's Depo. pp. 18 and 31 and Rivera Aff., ¶ 6). Plaintiff

did not work weekends for Defendant as he worked at Disney World every Saturday and Sunday (Plaintiff's Depo., pp. 9-11 and Rivera Aff., ¶ 11).

The Ugly Ripe and round tomato processing lines often operated on weekends (Plaintiff's Depo., pp. 31 and 83-84). When that occurred, other employees had to fill in on Plaintiff's forklift position (Plaintiff's Depo., pp. 31, 38 and 84). After several months of supervising the Ugly Ripe tomato department, Rivera determined that the Ugly Ripe tomato processing line was not operating efficiently (Rivera Aff., ¶ 8). Rivera determined that it was not efficient to have other employees fill in for Plaintiff on the weekends as the Ugly Ripe forklift operator was expected to keep up with the inventory rotation and to identify which pallets of tomatoes were ready for processing (Rivera Aff., ¶ 8). In May 2005, Defendant's President Don Long ("Long") and Rivera decided to require that the forklift operator for the Ugly Ripe and round tomato processing lines be available to work weekends (Rivera Aff., ¶ 9).

On several occasions in late May and early June 2005, Rivera asked Plaintiff to work on the weekend since the Ugly Ripe tomato processing line was operating on the weekend (Plaintiff's Depo., pp. 36-37, 59, 67 and 83-84 and Rivera Aff., ¶ 10). Plaintiff refused to work on the requested weekends since he was working at Disney World on the weekends (Plaintiff's Depo. pp. 36-37, 67 and 83-84 and Rivera Aff., ¶ 11). On June 14, 2005, Rivera, with Long's approval, notified Plaintiff he was being removed as the Ugly Ripe forklift operator because he was unable to work on weekends as necessary (Plaintiff's Depo., Exh. 5 and Rivera Aff., ¶ 12). Patricio Garcia ("Garcia"), an employee who had been operating a forklift in Defendant's shipping department, replaced Plaintiff as the Ugly Ripe forklift operator (Plaintiff's Depo., pp. 46 and 92 and Rivera Aff., ¶ 13). Garcia had been a trained and certified forklift operator since

at least February 2001 (Mark Brady Aff., ¶ 4 and Phillips Aff., ¶ 7). Garcia was required to work weekends (Rivera Aff., ¶ 13).

## 2.     **Pallet Jack Operator**

Rather than dismissing Plaintiff, Rivera tried to find Plaintiff another position with Defendant (Rivera Aff., ¶ 12). Rivera asked other department managers if they had a job for Plaintiff where he could work in a similar position on a five-day per week basis (Rivera Aff., ¶ 12). However, no such position was available. When Rivera informed Plaintiff that no such position was available, Plaintiff claims Rivera told him that "nobody wanted [him] here" (Plaintiff's Depo., pp. 39-41, 70 and Exh. 5 and Rivera Aff., ¶ 12). On June 20, 2005, Rivera reassigned Plaintiff to a pallet jack operator position in the Ugly Ripe department (Plaintiff's Depo., pp. 43-44, 71 and Exh. 5 and Rivera Aff., ¶ 12). Plaintiff's wage was reduced from $10.50 per hour to $8.00 per hour -- the wage earned by other pallet jack operators (Plaintiff's Depo., pp. 45 and 73 and Rivera Aff., ¶ 14). Plaintiff was also offered the opportunity to work as a courier driver on a Monday through Friday basis, at a pay of $8.00 per hour. However, Plaintiff decline that position (Plaintiff's Depo., pp. 106-107 and Rivera Aff., ¶ 15).

When Plaintiff expressed his displeasure about his reassignment to pallet jack operator, Rivera told Plaintiff he could complain to the "front office" (Plaintiff's Depo., p. 72 and Exh. 5 and Rivera Aff., ¶ 12). On several occasions Plaintiff claims he attempted to speak with then Human Resources Manager Angelia Cassell, but she "would not see him" (Plaintiff's Depo., pp. 61-64 , 72-73 and Exh. 5). On June 24, 2005, Plaintiff filed a Charge of Discrimination with the United States Employment Opportunity Commission ("EEOC") alleging harassment by Rivera, threats of termination by Rivera, and discrimination based upon his national origin with respect

to his demotion (Plaintiff's Depo., pp. 69, 74 and Exh. 6 and Phillips Aff., ¶ 3). After the EEOC notified Defendant of Plaintiff's charge, Defendant advised the EEOC that if Plaintiff wanted to return to his position as the Ugly Ripe forklift operator he could do so as long as he was willing to work weekends (Phillips Aff., ¶ 3 and Exh. 1 and Rivera Aff., ¶ 23). The EEOC notified Defendant that Plaintiff was not interested in the Ugly Ripe fork lift operator position so long as it required him to work weekends (Phillips Aff., ¶ 4 and Rivera Aff., ¶23).

While he was employed as a pallet jack operator, Plaintiff worked similar hours as other workers on the Ugly Ripe tomato line (except for weekends)(Rivera Aff., ¶ 16). The hours fluctuated greatly, however, depending upon the volume of tomatoes delivered for processing, and on several occasions, the Ugly Ripe workers only worked a few hours a day (Plaintiff's Depo., p. 87 and Rivera Aff., ¶ 16). Plaintiff claims that he was the only "white person" being sent home on a regular basis (Plaintiff's Depo., p. 84). However, Plaintiff admits that other employees (including Hispanic employees) were also sent home (Plaintiff's Depo., p. 87). In fact, on July 18, 2005, while Plaintiff worked 4.5 hours, pallet jack operators Juan Ramirez ("Ramirez"), Javier Alonzo ("Alonzo"), Maria De Jesus Garcia ("De Jesus Garcia") , and Pedro Garcia ("P. Garcia")(all Hispanic) worked 4.0, 4.3, 2.3 and 3.0 hours respectively (Phillips Aff., ¶8). On July 19-20 and July 22, 2005, Plaintiff, De Jesus Garcia, and Alonzo did not work at all (Phillips Aff., ¶ 8). On July 21, 2005, Plaintiff, De Jesus Garcia and Alonzo only worked 1.3 hours (Phillips Aff., ¶ 8). Plaintiff concedes he was not aware if there was sufficient work (including on other processing lines) to permit everyone to work a full day everyday (Plaintiff's Depo., p. 85).

### 3.     Ugly Ripe Line Worker

In early August 2005, Rivera informed Plaintiff that he was being let go due to the fact that Rivera did not have sufficient work for him to do as a pallet jack operator (Plaintiff's Depo., pp. 89-91 and Rivera Aff., ¶ 17).  However, rather than terminating Plaintiff, Rivera subsequently offered Plaintiff the opportunity to work as a line worker on the Ugly Ripe line (Plaintiff's Depo., p. 94 and Exh. 5 and Rivera Aff., ¶17).  Plaintiff accepted the position, and although line workers earned less than pallet jack operators, Plaintiff's pay was not reduced (Plaintiff's Depo., p. 94 and Rivera Aff., ¶ 17 and Exh. 2).

As a line worker on the Ugly Ripe line, Plaintiff was required to stack and unstack plastic tomato containers, to gently place or remove each tomato from the conveyor belt as the tomatoes were checked, graded and cleaned, and to package and stack the finished product (Plaintiff's Depo., pp. 93-94 and Rivera Aff., ¶ 18).  The Ugly Ripe tomato is more "tender and sensitive" than most tomatoes, and therefore, it is essential that line workers carefully handle each Ugly Ripe tomato individually during processing (Plaintiff's Depo., p. 96 and Rivera Aff., ¶ 18).  In fact, Ugly Ripe tomatoes are so sensitive that they are placed in plastic containers with plastic bubble wrap between the layers to guard against bruising (Rivera Aff., ¶ 18).

On several occasions, Rivera noticed Plaintiff handling the Ugly Ripe tomatoes without the necessary care (Rivera Aff., ¶ 19).   On August 12, 2005, Rivera verbally counseled Plaintiff to stop throwing the tomatoes (Plaintiff's Depo., pp. 95-96 and Exh. 5 and Rivera Aff., ¶ 19).  Plaintiff responded to Rivera that he was just doing "what everyone else is doing" (Plaintiff's Depo., p. 96 and Rivera Aff., ¶ 19).  On September 28, 2005, Rivera again talked to Plaintiff about how he was handling the Ugly Ripe tomatoes (Plaintiff's Depo., p. 97 and Rivera Aff., ¶

20). On that same day, after consulting with Human Resources Manager Angelia Cassell and Controller Sandi Phillips, Rivera dismissed Plaintiff from his employment (Plaintiff's Depo., p. 100 and Rivera Aff., ¶20 and Exh. 3). Rivera claims he has disciplined, and even summarily terminated, both Hispanic and non-Hispanic employees for mishandling produce after being warned (Rivera Aff., ¶ 24). Plaintiff admits he does not know whether Rivera has terminated any Hispanic employees for mishandling tomatoes on the line (Plaintiff's Depo., p. 122).

On December 21, 2005, Plaintiff filed this action against Defendant (Doc. Nos. 1 and 2). In the complaint, Plaintiff asserts claims for violation of the Florida Civil Rights Act of 1992, § 760.01 *et seq.* ("FCRA")(Count I), violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII")(Count II), and retaliation in violation of the Florida Whistleblower Act, Florida Statute § 448.101 *et seq.* (Count III).

## **II.**     **Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. Id. at 325. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. See id. When a moving party has discharged its burden, the non-moving party must

then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial.  Id. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness."  [citation omitted].  The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts.  When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.  See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

**III.    Discussion**

    **A.    Discrimination Claims**[2]

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S. C. § 2000e-2(a)(1). In this case, Plaintiff alleges he was subjected to unlawful discrimination on account of his race, Caucasian, when he was reassigned from his position as the Ugly Ripe forklift operator to the position of pallet jack operator and, subsequently, to the position of line worker -- and thereafter terminated. A prima facie case of discrimination can be made by either direct evidence or circumstantial evidence.

    **1.    Direct Evidence**

Direct evidence is evidence that proves the existence of a fact without inference or presumption. See Scott v. Suncoast Beverage Sales, LTD, 295 F.3d 1223, 1227 (11th Cir. 2002). In cases involving discrimination, "[t]he Eleventh Circuit has stated that 'only the most blatant remarks, whose intent could be nothing other than to discriminate on the [protected classification] are direct evidence of discrimination." Id. (quoting Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1359 (11th Cir. 1999)). Furthermore, such "evidence must indicate that the complained-of employment decision was motivated by the decisionmaker's [animus]." Damon, 196 F.3d at 1358-59. To establish direct evidence, a

---

[2] Plaintiff alleges discrimination under Title VII and the FCRA. The Eleventh Circuit has recognized that a Title VII analysis applies to claims of discrimination under the FCRA. See Bass v. Bd. of County Com'rs, Orange County, Florida, 256 F.3d 1095, 1109 n.4 (11th Cir. 2001).

statement must: (1) be made by a decisionmaker; (2) relate to the challenged employment decision; and (3) be motivated by a discriminatory animus. See id. Therefore, "remarks by non-decisionmakers or remarks unrelated to the decision making process itself are not direct evidence of discrimination." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

Plaintiff admits that Rivera never made any direct derogatory comments to Plaintiff about his race (Plaintiff's Depo., p. 51). However, Plaintiff still argues that he has presented direct evidence of discrimination (Doc. No. 21, pp. 2-4). Plaintiff's sole evidence of a prima facie case of discrimination by direct evidence is that on August 18, 2005, an individual named Ismael acknowledged that Rivera was trying to force Plaintiff to resign on account of Plaintiff's race (Plaintiff's Depo., pp. 52 and 97-98 and Exh. 5). Specifically, Plaintiff testified in his deposition:

> And when I was on the [Ugly Ripe processing] line, Ismael came up to me and said that I need to work faster. And I said, why? He said because Manuel [Rivera] is watching me. And I told - I had made the statement that I am the only white person left on this line. And I said, he's trying to make me quit. And he said that he knows that.

(Plaintiff's Depo., p. 52).

Plaintiff does not specifically identify who Ismael is or what his position is with Defendant.[3] As such, this alleged statement by Ismael cannot constitute direct evidence of discrimination since Ismael does not appear to be a decisionmaker as pertains to Plaintiff's employment as he was not a part of the decision to ultimately terminate Plaintiff. Additionally, Plaintiff fails to present any facts which show a nexus between Ismael's stray comment and any

---

[3]This Court "is under no duty to plumb the record in order to find a genuine issue of material fact." Bender v. City of Clearwater, 2006 WL 1046944, at *17 (M.D. Fla. April 19, 2006)(citations omitted).

employment decision.

## 2. Circumstantial Evidence

A plaintiff can establish a prima facie case of discrimination based on circumstantial evidence by showing: (1) he belonged to a protected class; (2) he suffered an adverse employment action; (3) the employer treated similarly situated employees outside of the protected class more favorably; and (4) he was qualified to do the job. See Scott, 295 F.3d at 1228; see also Vessels v. Atlanta Indep. School Sys., 408 F.3d 763, 767-68 (11th Cir. 2005)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). If the plaintiff is successful in establishing his prima facie showing of discrimination, the employer must then articulate a legitimate non-discriminatory rationale for its decision. See Vessels, 408 F.2d at 767-68. Once the employer articulates a reason, the plaintiff has the burden to prove that the employer's reason is pretextual. See id.

In the instant case, Defendant does not argue that Plaintiff is not a member of a protected class or that Plaintiff has not suffered an adverse employment action. However, Defendant argues that Plaintiff cannot establish a prima facie case of discrimination with respect to his reassignment from forklift operator to pallet jack operator because he was not qualified for the Ugly Ripe forklift operator position once Defendant decided that the position necessitated weekend availability and Plaintiff would not work weekends. In addition, with respect to Plaintiff's reassignments and subsequent dismissal, Defendant argues that Plaintiff cannot demonstrate that he was treated less favorably than non-Caucasian employees. Lastly, even assuming that Plaintiff can establish a prima facie showing of discrimination, Defendant argues that his claims nonetheless fail as he cannot establish that Defendant's legitimate, non-

discriminatory reasons for the treatment were pretextual.

### Plaintiff's Qualifications For Forklift Operator Position

To demonstrate that he was qualified for the Ugly Ripe forklift operator position, Plaintiff must show that he satisfied Defendant's "objective qualifications" for the Ugly Ripe forklift operator position. See Vessels, 408 F.3d at 769; see also Roper v. Foley, 177 Fed. Appx. 40, 48 (11th Cir. 2006). Plaintiff contends that since he was not "formally required" to work weekends he was qualified for the position of Ugly Ripe forklift operator. The Court finds this contention unavailing.

In May 2005, Defendant made the decision to require the Ugly Ripe forklift operator to be available to work whenever the processing line was scheduled to work, including weekends. Defendant has submitted evidence that demonstrates that Plaintiff was unwilling to work weekends, including evidence that subsequent to his June 24, 2005 EEOC charge, Defendant offered to return Plaintiff to his position as the Ugly Ripe forklift operator if he was willing to work weekends. Plaintiff does not dispute that he would not work weekends. Plaintiff's unwillingness to work weekends as necessary precludes him from establishing that he was qualified for the Ugly Ripe forklift operator position as of May 2005. See Jackson v. Veterans Admin., 22 F.3d 277, 279 (11th Cir. 1994)(stating that a plaintiff who could not be present at the job was not qualified).

Defendant argues, and this Court agrees, that the fact that Plaintiff was qualified for the position of Ugly Ripe forklift operator prior to May 2005 is of no consequence since it is undisputed that Defendant modified the job requirements of the Ugly Ripe forklift operator to require weekend work. Defendant's President Long, who is also Caucasian, supported the job

requirement of weekend availability for the Ugly Ripe forklift operator, and Plaintiff's Hispanic replacement, Garcia, was required to work weekends. As such, Plaintiff cannot establish that he was qualified to do the job as of May 2005.

### Treatment of Similarly Situated Employees Outside of the Protected Class

"To make a comparison of the plaintiff's treatment to that of [employees outside of his protected class], the plaintiff must show that he and the employees are similarly situated in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Furthermore, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Id. Plaintiff argues that non-Caucasian employees were treated differently than he was treated. Specifically, Plaintiff contends that he was discriminated against by being reassigned from his Ugly Ripe forklift operator position, being sent home from work and not being allowed to work a full day, being reassigned from his pallet jack operator position due to a line worker, and ultimately being dismissed.

The facts in evidence establish that Plaintiff was treated the same as the Hispanic employees. Garcia, who was Hispanic and replaced Plaintiff as the Ugly Ripe fork lift operator, was required to work weekends. Hispanic employees, like Plaintiff, were also sent home early when there was insufficient work. Lastly, Hispanic workers were counseled and dismissed by Rivera for mishandling the tomatoes.

To the extent that Plaintiff argues that his termination establishes that he was treated less favorably than non-Caucasian co-workers, this claim fails. Plaintiff has failed to present any evidence that other non-Caucasian employees were similarly situated and treated more favorably. Specifically, he has failed to present any evidence of non-Caucasian Ugly Ripe line

13

workers who were orally counseled regarding their handing of produce on several occasions but were not fired.

Plaintiff has failed to establish that the Defendant treated similarly situated employees outside of his protected class more favorably. In fact, he has not identified a single similarly situated employee, outside of his protected class, who was treated more favorable than him.

### **Pretext**

Even assuming that Plaintiff could establish a prima facie case of discrimination, he has not shown that Defendant's personnel decisions, including its proffered non-discriminatory reason for firing him, were pretextual. Pretext means more than an inconsistency or a mistake, pretext is "a lie, specifically a phony reason for some action." Silvera v. Orange County School Bd., 244 F.3d 1253, 1261 (11th Cir. 2001). A plaintiff cannot establish pretext by merely questioning the wisdom of the employer's reasoning, especially where "the reason is one that might motivate a reasonable employer." Lee v. GTE Florida, Inc., 226 F.3d 1249, 1255 (11th Cir. 2000)(quoting Wolf v. Buss (America) Inc.), 77 F.3d 914, 919 (7th Cir. 1996)). Finally, courts cannot reexamine an employer's business decisions; the court's inquiry is limited to determining whether the employer gave an honest explanation for its behavior. See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

Here Defendant made a business decision to keep the Ugly Ripe processing line working on the weekends. It reassigned Plaintiff from the Ugly Ripe forklift operator position to pallet jack operator, with its corresponding reduction in pay rate, based upon his unwillingness to work weekends. Defendant's business decisions to occasionally send Plaintiff home from work while he was a pallet jack operator were based upon fluctuations in workload. Plaintiff's subsequent

transfer to the position of line worker was also based upon a business decision as a result of a slowdown in the volume of work, thereby obviating the need for another pallet jack operator. Finally, Plaintiff's dismissal was based upon his mishandling of Defendant's Ugly Ripe tomatoes after having been orally counseled about mishandling.

In his attempt to establish pretext, Plaintiff relies upon his own speculation and the fact that several other Caucasians that worked in Rivera's department had been terminated, transferred or quit. Specifically, it is Plaintiff's belief that Rivera, who is Hispanic, was attempting to eliminate all Caucasian employees in his department. In his deposition, Plaintiff mentions Strano, Gayle Johnson ("Johnson"), Miller[4] and Kari Porowski[5] (Plaintiff's Depo., pp. 47-49). However, the evidence in this case establishes that Johnson and Porowski voluntarily left the department and that Strano was terminated for job-related concerns (Rivera Aff., ¶¶7 and 21-22).

With respect to the stated reasons for his termination (i.e., not handling the Ugly Ripe tomatoes with the requisite care after being orally counseled to do so), Plaintiff argues that he did not mishandle Defendant's product. However, the sole evidence Plaintiff presents is his own deposition testimony:

> I was handling them appropriately not only in [my] mind but also in my direct supervisor's mind and that would be Rudy. He had no problem with the way I was working.

---

[4] Plaintiff identified a Caucasian employee with the last name of Miller who was transferred. Plaintiff did not know her first name and admitted that he had no idea why she was transferred and that he had never talked to her or anybody else about her (Plaintiff's Depo., p. 49).

[5] Plaintiff does not refer to Kari Porowski by name, rather he refers to her as "Gayle's daughter."

...

(Plaintiff's Depo., p. 96).  Apparently, Rudy was Plaintiff's direct line supervisor (Doc. No. 21, p. 7).  However, in responding to Defendant's motion for summary judgment, Plaintiff has failed to specifically identify Rudy, the position he held with Defendant, or whether Rudy was present during the episodes when Rivera counseled Plaintiff with respect to his handling of tomatoes.

In short, Plaintiff has presented no evidence from which a jury could infer that Defendant's stated reasons for its employment actions were pretextual.  Specifically, he has not presented evidence that Defendant was not justified in reassigning him and subsequently terminating him.  Nor has he established that discriminatory reasons more likely motivated Defendant to reassign and terminate him.

### B. Plaintiff's Claim Under the Florida Whistle Blower Act

Plaintiff has also brought a claim pursuant to the Florida Whistle Blower Act, Florida Statute § 448.101 *et seq.* (Count III).  Specifically, Plaintiff contends that his dismissal in September 2005 was retaliatory for his having filed a charge in June 2005 with the EEOC in which he objected to Defendant's purported violations of Title VII and the FCRA.

Claims under the Florida Whistle Blower Act are analyzed under the same framework as Title VII retaliation claims.  See Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000); see also Bell v. Georgia-Pacific Corp., 390 F. Supp. 2d 1182, 1187-88 (M.D. Fla. 2005).  Under this framework, to establish a prima facie case of retaliation, plaintiff must show: (1) there was a statutorily protected participation; (2) an adverse employment action occurred; and (3) there was a causal link between the participation and the adverse action.  See Bell, 390 F. Supp. 2d at 1187-88.  "To establish the requisite causal connection in presenting a prima facie case, the Plaintiff need only show that the protected activity and his termination were not 'wholly

unrelated.'" Id. at 1191. If a prima facie showing is made, the employer must then proffer a legitimate, non-retaliatory reason for its decision. See Sierminski, 216 F.3d at 950. The plaintiff must then establish that the employer's reason is pretextual. See id.

However, to the extent that Plaintiff's claims for discrimination fail, his claim under the Florida Whistleblower Act also fails as the statute only protects against retaliatory personnel action taken because the employee has objected to or disclosed a "violation of law, rule, or regulation." Florida Statute § 448.102(1). Unlike Title VII's unlawful retaliation provisions, Florida Statute § 448.102(1) has been interpreted to require that a plaintiff prove that the employer actually violated a law, rule, or regulation. See White v. Purdue Pharma, Inc., 369 F. Supp. 2d 1335, 1337 (M.D. Fla. 2005); see also Barlow v. Conagra Foods, Inc., 2005 WL 3133474, *4 (M.D. Fla. November 23, 2005). Therefore, since Plaintiff has not established that Defendant actually violated a law, rule, or regulation in that he has not established that Defendant discriminated against him, his claim under the Florida Whistleblower Act fails.

### C.    Plaintiff's Damages

Since the Court finds that Defendant is entitled to summary judgment on Plaintiff's claims, it is not necessary for this Court to reach the issue of reinstatement or front pay.

### IV.    Conclusion

The Court finds that Plaintiff has not established a prima facie case of discrimination. Furthermore, even had Plaintiff established a prima facie case of discrimination, there is no evidence that Defendant's stated business reasons for its employment actions were pretextual. Accordingly, the Court finds that Defendant is entitled to summary judgment on Plaintiff's Title VII and FCRA claims (Count I and II). Additionally, because Plaintiff has not established that

Defendant discriminated against him, Defendant is entitled to summary judgment on Plaintiff's claim under the Florida Whistleblower Act (Count III).

Accordingly, it is **ORDERED AND ADJUDGED** that:

(1) Defendant's motion for summary judgment (Doc. No. 17) is **GRANTED**.

(2) The Pretrial Conference in the above-captioned matter scheduled for Thursday, April 5, 2007 at 8:30 a.m. is hereby cancelled.

(3) The Clerk is directed to enter judgment in favor of Defendant and to **CLOSE** this case.

**DONE AND ORDERED** at Tampa, Florida, this 30th day of March, 2007.

Copies to:

Counsel of Record

SUSAN C. BUCKLEW
United States District Judge